AO 106A (06/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | |
| 4781 South Moorpark Avenue #81-33, Moorpark, | ) | |
| California 93021 | ) | Case No.   2:25-MJ-03855 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

      I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343 | Wire Fraud, Conspiracy to Commit Wire Fraud, |
| 1349; 1956 and 1957 | and Conspiracy to Commit Money Laundering |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Teresa Healy, USSS Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: <u>Los Angeles, CA</u>_____

_____
*Judge's signature*

Hon. Brianna F. Mircheff, U.S. Magistrate Judge
*Printed name and title*

AUSA: Erik Silber- 213-894-2231

## <u>ATTACHMENT A-1</u>

<u>PREMISES TO BE SEARCHED</u>

SUBJECT PREMISES 1, as depicted in the photograph below, is located at 4781 South Moorpark Avenue #81-33, Moorpark, California 93021.  SUBJECT PREMISES 1 is a second-floor unit within a two-story apartment complex building with the street number 4781 displayed on the top of the beige stucco exterior. SUBJECT PREMISES 1 has the number 33 affixed to the right side of the unit door.



**ATTACHMENT B**

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence of violations of 18 U.S.C. §§ 1343 (Wire Fraud); 1349 (Conspiracy to Commit Wire Fraud); and 1956 and 1957 (Conspiracy to Commit Money Laundering) (the "Subject Offenses"), from January 1, 2018, to the present, namely:

a.   Any documents and records of financial transactions to include bank statements, deposit and withdrawal slips, bank receipts, signature cards, debit/credit cards, receipts of ATM withdrawals or purchases made with debit/credit cards, receipts for cashier's checks, wire transfer documents, ledgers, journals, and any documents containing the personal identifying information ("PII") of in any name other than Sergio Martin Burgos ANTEZANA, Byoungho Benjamin KIM, BV HiTech Inc., or WTL Systems Inc.

b.   Any documents and records of financial transactions to include bank statements, deposit and withdrawal slips, bank receipts, signature cards, debit/credit cards, receipts of ATM withdrawals or purchases made with debit/credit cards, receipts for cashier's checks, wire transfer documents, ledgers, and journals in any name of BV HiTech Inc. or WTL Systems Inc.

c.   U.S. Currency over $1,000, receipts from money services bureaus, money orders, cashier's checks, prepaid gift

cards, and any other cash equivalent capable of being used in laundering/conversion of the proceeds of the crime.

       d.   Records and information related to the use of, or access to, Forum 1 or other Russian-based chat discussions.

       e.   Records and information relating to PayPal accounts linked to the businesses BV HiTech Inc. or WTL Systems Inc.

       f.   Records and information relating to PayPal accounts opened using PII in any name other than Sergio Martin Burgos ANTEZANA, Byoungho Benjamin KIM, BV HiTech Inc., or WTL Systems Inc.

       g.   Records and information relating to PayPal checks and mail from PayPal to include PayPal checks and mail in the name of BV HiTech Inc. or WTL Systems Inc., and any mail from PayPal containing the PII in any name other than other than Sergio Martin Burgos ANTEZANA, Byoungho Benjamin KIM, BV HiTech Inc., or WTL Systems Inc;

       h.   Records and information about the business operations of BV HiTech Inc. or WTL Systems Inc., including invoices, contracts, purchase orders, in the name of BV HiTech Inc. or WTL Systems Inc.;

       i.   Records and information relating to bank accounts in the name of BV HiTech Inc., WTL Systems Inc., Byoungho Benjamin KIM, Meesun Kim, Sarah Kim, or Sergio Martin Burgos ANTEZANA;

       j.   Records and information relating to the formation and ownership of Commercial Mail Receiving Agency (CMRA) boxes

in the name of BV HiTech Inc., WTL Systems Inc., Byoungho
Benjamin KIM, or Sergio Martin Burgos ANTEZANA;

      k.   Cryptocurrency transactions by Byoungho Benjamin
KIM or Sergio Martin Burgos ANTEZANA made with Over the Counter
traders or similar brokers including details of amounts, dates,
and parties involved;

      l.   Bank statements, wire transfer records, and
deposit records for BV HiTech Inc., WTL Systems Inc., Byoungho
Benjamin KIM, or ANTEZANA;

      m.   Records and information related to where money is
being stored or transferred by Byoungho Benjamin KIM, Sergio
Martin Burgos ANTEZANA, BV HiTech Inc. or WTL Systems Inc.;

      n.   Virtual currency and related records of any kind,
to include: any and all representations of virtual currency
public keys or addresses, whether in electronic or physical
format; any and all representations of virtual currency private
keys, whether in electronic or physical format; any and all
representations of virtual currency wallets or their
constitutive parts, whether in electronic or physical format, to
include recovery keys which may be used to regenerate a wallet;[2]

---

[2] In order to effectuate this seizure, the United States is
authorized to load any wallet files, their constitutive parts,
or private keys, onto the Government's own servers.  The United
States is further authorized to transfer any identified virtual
currency to a virtual currency address controlled by the United
States.  The United States is also authorized to maintain a copy
of the virtual currency wallet file(s) loaded onto the
Government's servers.  The restored wallet file(s) will continue
to collect any bitcoin transferred into the seized bitcoin
wallets as a result of transactions that were pending at the
time of the seizure.  The United States is authorized to
transfer any bitcoin received by the restored wallet(s) into a
virtual currency address controlled by the United States.

o.   Any indicia of occupancy, residency, or ownership of the Subject Residences or Subject Vehicles, including, but not limited to forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing; and

p.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

q.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

ii.   Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

iii. Evidence of the attachment of other devices.

iv.   Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device.

v.   Evidence of the times the device was used.

vi.  applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

vii. records of or information about Internet Protocol addresses used by the device.

2. As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and
security devices.

II. **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.    In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
one year from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this one-year period without obtaining
an extension of time order from the Court.

b.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.    The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to

xiii

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

       ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

     c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

     d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

     e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

     f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    During the execution of this search warrant, law enforcement personnel are authorized to: (1) depress Byoungho Benjamin KIM's or Sergio Martin Burgos ANTEZANA's thumb and/or fingerprints onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific

finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front Byoungho Benjamin KIM's or Sergio Martin Burgos ANTEZANA's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Teresa Healy, being duly sworn, declare and state as follows:

## I. BACKGROUND OF AFFIANT

1.  I am a Special Agent with the United States Secret Service ("USSS") and have been so employed since April 2016.  I am currently assigned to the Homeland Security Investigations ("HSI") El Camino Real Financial Crimes Taskforce in Los Angeles, CA.

2.  In becoming a Special Agent, I have completed criminal investigative training, including the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, and the USSS Special Agent Training Course at the James J. Rowley Training Center in Beltsville, Maryland. I have attended multiple advanced and in-service trainings regarding the investigation of cyber-enabled financial crimes, including the Basic Investigation of Computer and Electronic Crimes, Network Intrusion Triage and Response, and training regarding money laundering and asset forfeiture.

3.  During my tenure as a Special Agent with USSS, I have investigated and arrested numerous individuals for federal felony offenses including wire fraud, bank fraud, identity theft, money laundering, and access device fraud, among other offenses.  During these investigations, I have personally obtained or participated in the execution of search and seizure warrants for suspect premises and electronic devices.

## II. <u>PURPOSE OF AFFIDAVIT</u>

4.    This affidavit is made in support of an application to search the following:

a.    The premises located at 4781 South Moorpark Avenue #81-33, Moorpark, California 93021 ("SUBJECT PREMISES 1"), as described more fully in Attachment A-1, which is believed to be the primary residence of Byoungho Benjamin Kim ("B. KIM");

b.    The premises located at 3717 E Thousand Oaks Boulevard, Suite 274, Westlake Village, California 91362 ("SUBJECT PREMISES 2"), which is believed to be the business address of BV HiTech Inc. and WTL Systems Inc. as described more fully in Attachment A-2;

c.    The premises located at 2212 Plant Avenue Apartment B, Redondo Beach, California 90278 ("SUBJECT PREMISES 3"), as described more fully in Attachment A-3, which is believed to be the primary residence of Sergio Martin Burgos Antezana ("ANTEZANA");

d.    A BMW vehicle bearing California license plate 8LUN613 and Vehicle Identification Number (VIN) 5UXTR9C50JLD62619 ("SUBJECT VEHICLE 1"), as described more fully in attachment A-4, which is registered to BV HiTech Inc.;

e.    A Toyota vehicle bearing California license plate 8NGA145 and Vehicle Identification Number (VIN) 2T3W1RFV1KC026086 ("SUBJECT VEHICLE 2"), as described more fully in attachment A-5, which is registered to ANTEZANA;

   f. The person of B. KIM, as described more fully in Attachment A-6;

   g. The person of ANTEZANA, as described more fully in Attachment A-7;

  5. The requested warrants seek authorization to seize evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1343 (Wire Fraud); 1349 (Conspiracy to Commit Wire Fraud); and 1956 and 1957 (Conspiracy to Commit Money Laundering), (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1 through A-7, and Attachment B, are incorporated herein by reference.

  6. Based on my training, experience, knowledge, and participation in criminal investigations, and accumulated knowledge from consultations with other law enforcement agents, including debriefings and interviews of known offenders in other cases, I also know the following:

   a. Fraud and money laundering offenses are activities which frequently continue over many months and even years;

   b. Offenders who commit fraud and money laundering offenses keep records of their illegal activities for a lengthy period of time, even beyond the time during which the crimes occurred;

   c. Offenders who commit fraud and money laundering offenses commonly maintain hard copy or computer files, books, records, receipts, notes, ledgers, journals, diaries, address

books, and other sundry materials, and papers relating to their
crimes; and

       d.   Offenders who commit fraud and money laundering
offenses often possess evidence, fruits, and instrumentalities
relating to such offenses at their homes, places of business,
and in their vehicles.

     7.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrants
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only, and all
dates and times listed are on or about those indicated.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

     8.   USSS Criminal Investigative Division (CID) received an
investigative lead from PayPal which identified two companies,
BV HiTech Inc. and WTL Systems Inc., for facilitating check
withdrawal services for suspected overseas cyber criminals.
Based on my training and experience, I know that individuals
involved in financial fraud schemes, especially those overseas,
often utilize U.S.-based third parties, such as BV HiTech Inc.
and WTL Systems Inc., to assist in the movement and laundering
of illicit funds.  In such schemes, physical checks are used to

conceal proceeds of fraud, rather than to conduct normal business operations.  The withdrawn funds reported in this investigation appear related to activity indicative of identity theft, unemployment insurance (UI) benefits fraud, automated clearing house (ACH) fraud, credit card fraud, account takeover, merchant fraud, and money laundering.  In addition, PayPal reviewed a sampling of the suspected accounts and discovered indicators of identity theft.

9.    Based upon records provided by PayPal, at least 1,262 unique PayPal accounts were linked to BV HiTech Inc. and WTL Systems Inc.  Based on California incorporation documents and statements made to bank representatives, BV HiTech Inc. and WTL Systems Inc. purport to sell computers parts and components. However, the funds received from PayPal are not from payments received from customers, but funds obtained from unrelated PayPal accounts mostly in the form of mailed paper checks. Based on my training and experience, it is highly unusual for a legitimate online business to receive payments in the form of mailed checks, especially when more common and efficient methods such as ACH, credit/debit card payments, or direct PayPal transactions are readily available.  Indeed, based on my training, experience, and knowledge in this case, I know that PayPal itself permits entity-to-entity electronic transmission of money, which is fast and easy to use.

10.    In total, from June 25, 2018, through May 8, 2024, over $2.8 million was received from PayPal, through check, ACH, and other deposits across 15 different banks and 47 unique

5

account numbers from accounts in the name of BV Hitech Inc., WTL
Systems Inc., B. KIM, Meesun Kim (B. KIM's sister), and
ANTEZANA.  Based on my training and experience, it is highly
unusual for a legitimate business, and its related business
entities, to receive funds in 47 accounts across 15 different
financial institutions within the same timeframe.

11.  B. KIM and ANTEZANA were identified as targets of a
USSS Tyler Resident Office investigation after conducting
numerous cryptocurrency trading transactions with a source
identified as CI#20-2382.  B. KIM and ANTEZANA sought to
exchange so-called "fiat" currency -- government-issued money
such as the U.S. dollar -- for Bitcoin (BTC), with the source of
funds primarily originating from the PayPal deposits referenced
above.  Based on my training and experience, criminal actors
frequently use Over-the-Counter (OTC) traders, similar to CI#20-
2382, rather than go through a public cryptocurrency exchanges
in order to avoid Know Your Customer (KYC) or anti-money
laundering (AML) protocols.  After converting the funds into
BTC, B. KIM and ANTEZANA would send the funds to an individual
posting on Russian criminal forums.  This individual advertised
on these forums the ability to cash out PayPal accounts that
were limited.  Based on my training and experience, individuals
involved in money laundering will use the fraud proceeds to buy
Bitcoin and then send it to another person, often someone
located overseas.  This method allows the subject to quickly
move money out of the United States with little oversight while
also hiding the illicit source of the funds.  I know from prior

investigations that this process is commonly used to launder money and hide the true source and ownership of the funds.

12.   BV HiTech Inc. and WTL Systems Inc. were originally registered in Simi Valley, California, but both were later updated to an address in Westlake Village, California.  B. KIM resides in Moorpark, California, and ANTEZANA resides in Redondo Beach, California.  All the addresses referenced above are located within the Central District of California.

13.   SUBJECT PREMISES 1 was identified through lease records, DMV records, surveillance, and real-time cellular location information of B. KIM's cellular phone.

14.   According to the California Department of Motor Vehicles, SUBJECT VEHICLE 1 is registered to BV HiTech Inc. and is believed to be utilized by B. KIM.  SUBJECT VEHICLE 1 was seen at the assigned parking spot of SUBJECT PREMISES 1 as of May 15, 2025.

15.   SUBJECT PREMISES 2 was identified through California business records, surveillance, and via the open-source website bvhitech.com.

16.   SUBJECT PREMISES 3 was identified through surveillance, Google email records showing food delivery and internet service setup receipts, and real-time cellular location information of ANTEZANA's cellular phone.

17.   According to the California Department of Motor Vehicles, SUBJECT VEHICLE 2 is registered to ANTEZANA.  SUBJECT VEHICLE 2 was seen outside of SUBJECT PREMISES 3 as of May 29, 2025.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Background on this Fraud Scheme**

18.    Based on information obtained from PayPal investigators, PayPal has a robust risk management system to detect fraud and limit customer accounts engaging in suspicious activity.  To protect PayPal and its customers, a permanent limitation may be placed on a customer's account, and the funds in that account may be held for up to 180 days.  After 180 days, PayPal is legally bound to release those funds to the customer, who may exit the funds to an active financial instrument linked to their PayPal account, add a new financial instrument, or request a check withdrawal.  PayPal identified two companies, BV HiTech Inc. and WTL Systems Inc., which appeared to facilitate check withdrawal services for suspected cyber criminals.  The withdrawn funds reported appear related to activity indicative of identity theft, UI benefits fraud, ACH fraud, credit card fraud, account takeover, merchant fraud, and money laundering. In addition, PayPal reviewed a sampling of the suspected accounts and discovered indicators of identity theft through public records checks and review of KYC documents provided by the account holders.

19.    Based upon records provided by PayPal, at least 1,262 unique PayPal accounts were linked to BV HiTech Inc. and WTL Systems Inc.  Based on review of these accounts, it appears most of these accounts were initially opened by unknown subjects utilizing personal identifying information (PII) of individuals across the United States.  In some instances, the PayPal

accounts that were opened with PII of individuals in the United States were associated, via the listed address, with individuals residing overseas, including, but not limited to, individuals located in Russia.  For example, three unique PayPal accounts listed the name Vitaliy Abakumov and included an address in Saint-Petersburg, Russia as one of the associated addresses.  In addition, three other unique accounts had the name Vasiliy Sh and included an address in Moscow, Russia as one of the associated addresses.  Based on my training and experience, foreign actors use stolen PII of U.S. persons to open accounts but enter their own foreign mailing address.  This can indicate that the account is being controlled by an overseas subject, even though it appears to be held in a U.S. person's name.

20.  As previously mentioned, the source of the funds into these PayPal accounts vary to include UI fraud, credit card fraud, account takeover, and other wire fraud schemes.  For example, approximately 86 PayPal accounts received UI payments totaling over $800,000 from various states, including Texas, Illinois, Arkansas, Ohio, Arizona, Connecticut, Florida, Indiana, Mississippi, Missouri, and Nevada.  Based on my training and experience, a legitimate business purporting to sell computer parts would not be receiving an individual person's unemployment insurance claim payment.

21.  Specifically, PayPal subscriber records reveal that from July 28, 2020, through July 30, 2020, the PayPal account ending in 6150 received two payments totaling $4,036 from TWC-BENEFITS | UI BENEFIT (Texas Unemployment Insurance Benefits).

The PayPal subscriber information listed the name F.C., the email address garyngthuangg@gmail.com, and provided an image of a California driver's license with the number U2281573, issued in the name of F.C.  On July 30, 2020, PayPal restricted the account ending in 6150.  On April 25, 2021, two check withdrawals of $2,930.50 and $97.50 were requested by BV HiTech Inc.

      a.  Based on my review of California Department of Vehicles (DMV) records, California driver's license number U2281573 does not exist.  Further, using the PII of F.C., I reviewed the real California driver's license of F.C., which did not match the driver's license photo in the PayPal records for the account ending in 6150.

      b.  On June 12, 2024, I received records from the Texas Workforce Commission detailing payments totaling $4,036 into PayPal account 6150.  Based on review of records, a claim was received by an unknown party who used another individual's PII, identified as S.C., and the email address garyngthuangg@gmail.com.

      b.  From August 16, 2024, through August 17, 2024, I identified and located S.C. who stated she never applied for Texas Unemployment Insurance benefits and has never authorized anyone to apply for benefits on her behalf.  In 2020, S.C. recalled receiving notification about the unauthorized claim and filed a complaint at the time.  In addition, S.C. did not open and has never used the PayPal account ending in 6150 in the name

of F.C.  Further, S.C. does not know the company, BV HiTech Inc. and has never requested check withdrawals from the company.

22.  Forum 1 is Russian language forum dedicated to the commission of cybercrime and is a place where criminals can safely buy and sell contraband.  The forum is limited to Russian-speaking cybercriminals who can demonstrate their criminal bona fides (typically in the form of references from other established cybercriminals who are already forum members). Law enforcement obtained Forum 1 records via an undercover purchase in January 2021.  The records are corroborated by public facing Forum 1 information and prior forensic images of Forum 1 obtained by law enforcement.  On August 9, 2018, an account was registered on Forum 1 using the moniker "molodec." The user profile identified molodec as a vendor of "cashout paypal."  Based on further review of Forum 1, molodec advertised the ability to cashout PayPal checks on accounts that are limited after 180 days.  In addition, in a message to an administrator of Forum 1, molodec provided the BTC wallet address 1AWava9SGF8WQXaNrPJVt9H4SqrMAsnCHU (the "MAsnCHU wallet") to receive payment from a dispute with another Forum 1 member.  Based on my training and experience, I know that forums such as Forum 1 have an arbitration system in which a forum member who feels they have been wronged during a transaction can bring a claim against another party.  Forum administrators act as arbiters in these disputes.  In addition, in a message to an administrator of Forum 1, molodec provided the MAsnCHU wallet.

**B.   USSS Tyler, Texas Resident Office Investigation**

23.   The USSS Tyler, Texas Resident Office has conducted cryptocurrency investigations involving the use of a trusted source of information who has intricate knowledge and expertise concerning cryptocurrency.  The source is identified as CI#20-2382.  CI#20-2382 resided within the Eastern District of Texas and operated along with undercover (UC) USSS agents within the Eastern District of Texas.  The UC bank accounts were held and operated by UC agents in the Eastern District of Texas.

24.   The undercover portion of this investigation utilized advertisements created by UC agents on various cryptocurrency trading platforms.  The advertisements, which were accessible to the general public, advertised the sale of Bitcoin exchange for cash deposits at UC banks accounts held by UC agents.

25.   Throughout the course of the investigation, more than 50 individuals have been indicted in connection with the operation.

26.   B. KIM was identified as a target of the investigation after he conducted numerous cryptocurrency transactions with CI#20-2382 beginning before the investigation and then continuing with CI#20-2382 and UC agents.

27.   Between March 2020 and April 2021, there were approximately 92 transactions wherein B. KIM sought to exchange U.S. currency (fiat) for BTC with CI#20-2382.  These transactions totaling approximately 95.169 BTC were sent to 85 unique wallet addresses.  Of that total, approximately 93.116

BTC was sent to 82 unique wallet addresses identified as LocalBitcoins deposit addresses.

28.    Based upon records received from LocalBitcoins, the 82 wallet addresses B. KIM provided to CI#20-2382 were associated with an account registered to Byoungho Benjamin Kim.  After receiving the BTC from CI#20-2382 into his LocalBitcoins account, B. KIM immediately sent the BTC to the MAsnCHU wallet.

29.    In total, from March 2, 2018, through March 2, 2021, B. KIM sent approximately 225.56 BTC to the MAsnCHU wallet.  As previously stated, the MAsnCHU wallet is believed to be controlled by molodec, the moniker posting on Forum 1, a Russian language criminal forum.  Based on my training and experience, I know that overseas actors, like molodec, face difficulty depositing and moving funds through U.S. financial institutions. The overseas actors can use a U.S.-based actor, such as B. KIM, to deposit into the U.S. banking system.  The U.S.-based actor may then keep a portion of the proceeds and forward the remainder to the overseas actor often via cryptocurrency for facilitating laundering the money.

30.    In communications with CI#20-2382 and UC agents, B. KIM stated the following:

       a. When asked to confirm business details to include a business name, B. KIM stated, "WTL Systems Inc" and then followed up with "for these invoices it's WTL Systems Inc. but we also have BV Hitech Inc."

       b. When asked for business details to include name, address, and email address, B. KIM responded,

> "name: sarah kim
>
> address: 3331 wolf creek court, simi valley, ca
> 93063
>
> email: sarah.wtlsys@gmail.com"

c. B. KIM referenced his mother (Sarah Kim) making deposits on his behalf.  For example, B. KIM stated to CI#20-2382, "if my mom makes the deposit is that okay? she can give u whatever info is needed… cus she's the business owner," and "i wanna pay from 4 different bank accounts thats why i'm asking to do it like this XD the cash deposit from me and the other 3 from my mom who is next to me… all the accounts are with her business, i need a wire for 8000, cash deposit for 7000, cashiers checks for 5k each."

d. B. KIM provided screenshots of a wire transaction from a Cathay Bank account ending in 5990 and stated, "5990 is my account number."

e. B. KIM stated, "can i just put any invoice # on these?... payment for inventory work? these are business accounts… on the wires though i will really want to put invoice #s."

f. B. KIM stated, "my bank is asking for some invoices for some of the transactions which i sent u…" At which point, CI#20-2382, provided 5 invoices and asked B. KIM to review them closely and think of a reason why his business would be doing business with the companies listed in the invoices.  B. KIM replied,

14

"honestly the people who work at this bank can hardly
speak english. I think if they just get these they
will lay off… let me know once you've sent all the
ones you are getting and i'll attach them in an email
to them."

### C.    Identification of Sergio Martin Burgos Antezana (ANTEZANA)

31.    On March 26, 2024, a United States Postal Inspector
(USPIS) informed USSS Agents that an individual had been
receiving a large quantity of USPS letters from PayPal addressed
to BV HiTech Inc. at a Commercial Mail Receiving Agency (CMRA)
in Redondo Beach, California.  The letters were addressed to
multiple individuals but not to the owner of the CMRA box.  The
owner of the CMRA box filled out a United States Postal Service
Application for Delivery of Mail Through Agent and provided
California identification card Y8984565 and a Peruvian passport
in the name of ANTEZANA.  In the application, ANTEZANA listed
his business as BV HiTech Inc. and identified the business as a
computer parts seller.

32.    On June 6, 2024, USPIS identified another CMRA box in
Manhattan Beach, California, under the name ANTEZANA and
intercepted additional letters from PayPal addressed to BV
HiTech Inc.  However, each letter also contained multiple names
that were not associated with ANTEZANA's mailbox.

33.    On March 3, 2025, USPIS, with permission from Paypal -
the sender of the mail - opened approximately 116 pieces of mail

previously intercepted from ANTEZANA's CMRA boxes in Redondo Beach and Manhattan Beach, as noted above.  Each piece of mail contained a check from PayPal issued in various individuals' names.  The checks totaled approximately $24,761.07.  As stated previously, the funds received from PayPal were not from customers of computer components but from accounts previously frozen by PayPal for suspected fraud.

34.  ANTEZANA was identified as a target of this investigation after conducting numerous cryptocurrency transactions with CI#20-2382 beginning before the investigation and then continuing with CI#20-2382 and UC agents.

35.  In communications with CI#20-2382 and UC agents, ANTEZANA stated as follows:

      a.  That he is friends with B. KIM, "in real life."

      b.  "I want to buy bitcoin through bank wire… 15k and it's a business account."

      c.  ANTEZANA also provided CI#20-2382 with a photo of his California identification card Y8984565 and a screenshot of a US Bank account ending in 9256 under the name Sergio Martin Burgos Antezana DBA Sergio Burgos Antezana.

      d.  ANTEZANA provided the email address sburgosan@gmail.com to CI#20-2382.

36.  Between July 28, 2020, and October 26, 2020, there were approximately 10 transactions wherein ANTEZANA sought to exchange U.S. currency for BTC with CI#20-2382.  These transactions totaling approximately 18.1529 BTC were sent to 10

unique wallet address identified as LocalBitcoins deposit addresses.

37.   Based upon records received from LocalBitcoins, the 10 wallet addresses ANTEZANA provided to CI#20-2382 were associated with a LocalBitcoins account registered to B. KIM.  As previously stated, once the BTC was received into B. KIM's LocalBitcoins account it was immediately sent to the MAsnCHU wallet.

38.   Based on records received from Coinbase, an account in the name of Sergio Burgos Antezana sent three separate transactions totaling 0.05 BTC to the MAsnCHU wallet.

39.   In total, B. KIM and ANTEZANA conducted or coordinated 102 separate cash deposit transactions totaling $1,460,417.99 into 51 different bank accounts provided by CI#20-2382 for BTC. Of that total, $1,081,521.17 (approx. 74%) were deposited into accounts of indicted co-conspirators.

**D.   Review of Bank Records**

40.   In total, from June 25, 2018, through May 8, 2024, over $2.8 million was received from PayPal, of which $1.9 million was in the form of check deposits, $843,802.19 in ACH deposits, and $101,697.80 in other deposits across 15 different banks and 47 unique account numbers from accounts in the name of BV HiTech Inc, WTL Systems Inc, B. KIM, Meesun Kim (B. KIM's sister), and ANTEZANA.  Below is a summary of the total amount of credits each account received from PayPal.

| Bank | Account Name | Account Number | Total Sum of Credits from PayPal |
|---|---|---|---|
| BANK OF AMERICA | WTL Systems Inc | 325137288535 | $ 5,941.97 |
| CATHAY BANK | WTL Systems Inc | 0034125990 | $ 262,471.37 |
| CATHAY BANK | WTL Systems Inc | 0034126007 | $ 4,987.54 |
| CATHAY BANK | WTL Systems Inc | 0034126015 | $ 14,432.34 |
| CATHAY BANK | BV Hitech Inc | 0034123334 | $ 38,820.83 |
| CATHAY BANK | BV Hitech Inc | 9389372232 | $ 38,975.64 |
| CATHAY BANK | Meesun Sandra Kim | 34121340 | $ 57.87 |
| CATHAY BANK | Meesun Sandra Kim | 9609787657 | $ 27,573.06 |
| CHASE | BV Hitech Inc | 0000009538J1580 | $ 85,709.49 |
| CITIBANK | Meesun Sandra Kim | 42004351211 | $ 275.72 |
| CITIBANK | Meesun Sandra Kim | 42004351252 | $ 12,000.00 |
| CITIBANK | Meesun Sandra Kim | 42005247988 | $ 1,800.21 |
| COMERICA BANK | BV Hitech Inc | 1895469250 | $ 168,046.04 |
| COMERICA BANK | BURGOS ANTEZANA PARTS 2000 | 1895469953 | $ 28,418.42 |
| FIRST BANK | BV Hitech Inc | 1319976617 | $ 9,518.60 |
| FIRST BANK | BV Hitech Inc | 1342012963 | $ 9,000.42 |
| FIRST BANK | BV Hitech Inc | 1638956260 | $ 30,290.76 |
| FIRST BANK | BV Hitech Inc | 1671558337 | $ 0.64 |
| FIRST BANK | BV Hitech Inc | 2295199189 | $ 5,400.81 |
| FIRST BANK | BV Hitech Inc | 2533512393 | $ 0.34 |
| FIRST BANK | BV Hitech Inc | 2645423590 | $ 44,147.44 |
| FIRST BANK | WTL Systems Inc | 1771479891 | $ 0.22 |
| FIRST BANK | WTL Systems Inc | 2099601356 | $ 5,992.17 |
| FIRST CITIZENS BANK | SERGIO MARTIN BURGOS ANTEZANA | 1171040522 | $ 95,054.51 |
| LBS FINANCIAL CREDIT UNION | MEESUN S KIM | 340902 | $ 6,298.77 |
| ORANGE COUNTY'S CREDIT UNION | MEESUN S KIM | 92640267-0041 | $ 6,700.21 |
| PREMIER AMERICA | BV Hitech Inc | 1300006994 | $ 66,295.29 |
| PREMIER AMERICA | BYOUNG HO BENJAMIN KIM | 290799 - 0001 | $ 25,000.21 |
| PREMIER AMERICA | BYOUNG HO BENJAMIN KIM | 290799 - 0100 | $ 22,700.47 |
| PREMIER AMERICA | BYOUNG HO BENJAMIN KIM | 290799 - 0101 | $ 14,000.35 |
| REVOLUT | SERGIO BURGOS ANTEZANA | 218537429062 | $ 118,039.22 |
| REVOLUT | KIM BYOUNGHO | 253597682446 | $ 67,641.55 |
| UNION BANK | BV Hitech Inc | 0110403984 | $ 1,317,965.88 |
| UNION BANK | BV Hitech Inc | 0110403992 | $ 990.16 |
| UNION BANK | BV Hitech Inc | 0110404018 | $ 9,150.53 |
| UNION BANK | BV Hitech Inc | 0110404026 | $ 16,700.46 |
| UNION BANK | BV Hitech Inc | 0110404034 | $ 9,101.34 |
| UNION BANK | BV Hitech Inc | 0110404042 | $ 10,000.18 |
| UNION BANK | Meesun Sandra Kim/Kim Digital | 0100245574 | $ 3,004.76 |
| UNION BANK | Meesun Sandra Kim/Kim Digital | 0100245582 | $ 6,978.63 |
| UNION BANK | Meesun Sandra Kim/Kim Digital | 0100245590 | $ 0.14 |
| UNION BANK | Meesun Sandra Kim/Kim Digital | 0100245639 | $ 7,340.23 |
| UNION BANK | Meesun Sandra Kim/Kim Digital | 0100245647 | $ 4,930.45 |
| UNION BANK | Meesun Sandra Kim/Kim Digital | 0100245655 | $ 0.14 |
| US BANK | SERGIO MARTIN BURGOS ANTEZANA | 157522419256 | $ 254,885.02 |
| VENTURA COUNTY CREDIT UNION | BYOUNG HO BENJAMIN KIM | 1976380 | $ 8,450.07 |
| WELLS FARGO | SERGIO MARTIN BURGOS ANTEZANA | 1470934546 | $ 880.64 |
| | | | $ 2,865,971.11 |

41.   Based on records received to date, 65 accounts across 15 various banks have been identified.  Based on my training and experience, it is highly unusual for a legitimate business and its related business entities to maintain a total of 65 accounts across 15 different financial institutions within the same timeframe.

42.   Based on review of the debits across the 65 accounts, over $1.2 million went to accounts associated with targets in the Tyler, Texas Resident office investigation.  In addition, there were $407,319.44 in branch withdrawals, which is a manual

withdrawal of funds conducted in person at a bank branch and $228,609.41 in cash withdrawals.

43.   Based upon records received from Cathay Bank, the account ending in 5990 was opened under the name WTL Systems Inc. and listed Meesun Kim and Sarah Kim as authorized signers. From July 7, 2020, through December 31, 2021, the account received $287,713.38.  Approximately $262,471.37 (approx. 91%) came from PayPal.  Of that total, $222,909.33 was in the form of PayPal checks and $39,562.04 was in the form of ACH withdrawals from PayPal.

44.   In addition, Cathay Bank provided communications between Sarah Kim and bank representatives.  When asked about the nature of the business, Sarah Kim stated, "Wholesaler for computer parts, components and software."  She also provided a list of the major supplies and major customers.  There were no incoming or outgoing payments to the suppliers or customers that Sarah Kim identified.

45.   On several occasions, the bank asked WTL Systems Inc. for a detailed description of the types of components sold, a location where the refurbished computer components were stored, and invoices of the incoming PayPal payments and outgoing wires. Sarah Kim never fully responded to the bank's questions but provided five invoices.  They were the same invoices provided in the chat between CI#20-2382 and B. KIM.  As stated above, B. KIM told CI#20-2382, "5990 is my account number," and referenced his mom (Sarah Kim) as the individual making deposits on his behalf.

46.  Based on my training, experience, and the evidence in this case, BV HiTech Inc. and WTL Systems Inc. do not appear to be legitimate computer parts businesses.  Instead, both businesses appear to exist to allow B. KIM and ANTEZANA to commit wire fraud and money laundering.

### E.    Identification of the SUBJECT PREMISES and SUBJECT VEHICLES

47.  Based on records received from the leasing company Avery at Moorpark, B. KIM has lived at SUBJECT PREMISES 1 since January 13, 2023, and signed a lease renewal on January 17, 2025, for a lease end on January 31, 2026.

48.  On the initial leasing application, B. KIM listed the following regarding his employment:

Employer: BV HiTech Inc.

Job Title: President

Supervisor Name: Sarah Kim

Business Address: 3717 E. Thousand Oaks Boulevard, Westlake Village, CA 91362

Monthly Income: $8,000

49.  The leasing renewal application listed B. KIM's vehicle as a white 2018 BMW X3 with California license plate 6LUN613 (SUBJECT VEHICLE 1) assigned to parking space 55.

50.  On May 15, 2025, at approximately 1:17 p.m., USSS Agents went to SUBJECT PREMISES 1, and observed SUBJECT VEHICLE 1 parked in spot 55.

51.  Based on a search of California DMV records, SUBJECT VEHICLE 1 is registered to BV HiTech Inc.  In addition, B. KIM

changed his DMV mailing address to SUBJECT PREMISES 1 on October 31, 2024.

52.  Based on an open-source search of BV HiTech Inc., USSS agents went to the website bvhitech.com.  The website advertises vague Information Technology (IT) solutions.  The website also has multiple spelling and punctuation errors including the following statement, "Increase the value of ypur IT portfolio while mitigating compliance risks associated with end-of-life technology assets."  The website did not offer any products to buy.  Instead, it provided a contact for the sales and service team.  At the bottom of the website, the address listed was 3717 E. Thousand Oaks Boulevard, Westlake Village, California 91362.

53.  Based on a California Business records search, articles of incorporation were filed on July 13, 2018, for BV HiTech Inc. and on October 31, 2019, for WTL Systems Inc.  Both companies listed addresses in Simi Valley, California as their business addresses.  On September 19, 2023, WTL Systems Inc. and on March 4, 2024, BV HiTech, Inc. both changed their principal business addresses to 3717 E. Thousand Oaks Boulevard, Westlake Village, California 91362.

54.  On May 15, 2025, USSS agents went to the 3717 E. Thousand Oaks Boulevard, Westlake Village, California 91362 address, which was identified as the Paseo Business Center. Agents reviewed the business center directory and located the name BV HiTech/WTL Systems listed at Suite "274."  Agents went to the second floor of the Paseo Business Center, and found the location listed in the directory.  To the right of the door was

a label reading "274," with "BV HiTech Inc." and "WTL Systems Inc." indicated below it.  SUBJECT PREMISES 2 was confirmed as 3717 E. Thousand Oaks Boulevard, Suite 274, Westlake Village, California 91362.

55.  On or about October 29, 2024, the Honorable John D. Love issued a warrant pursuant to 18 U.S.C. § 2703 ("Google Search Warrant") directing Google LLC to provide records relating to multiple email addresses including sburgosan@gmail.com.  As stated above, this is the email address ANTEZANA provided to CI#20-2382.

56.  Based on review of records from Google from July 8, 2023, through August 24, 2024, the email address sburgosan@gmail.com received approximately 29 emails from DoorDash for food delivery notification receipts to 2212 Plant Ave, Redondo Beach, California 90278.  In addition, there was an email from Frontier Communications on March 6, 2023, to set up internet service at 2212 Plant Ave, Apartment B, Redondo Beach, California 90278 for ANTEZANA.  On October 24, 2024, a TCGPlayer was billed and shipped to Sergio Burgos ANTEZANA at 2212 Plant Ave APT B, Redondo Beach, California 90278.  The address 2212 Plant Ave, Apartment B, Redondo Beach, California 90278 was confirmed as SUBJECT PREMISES 3.

57.  On May 7, 2025, at approximately 8:30 a.m., USSS agents went to SUBJECT PREMISES 3.  Agents observed a Toyota RAV4 with California license plate 8NGA145 parked on the street in front of the premises.  At approximately 8:40 a.m., a USSS agent observed the vehicle pull away.  After following the

vehicle, a USSS agent passed the vehicle and observed ANTEZANA as the individual driving the vehicle.

58. Based on a review of California DMV records, 8NGA145 is registered to Sergio Martin Burgos ANTEZANA. The Toyota RAV 4 with California license plate 8NGA145 is confirmed as SUBJECT VEHICLE 2.

59. On May 8, 2025, USSS agents observed SUBJECT VEHICLE 2 parked on the street outside of SUBJECT PREMISES 3 at approximately 9:05 a.m.

60. On May 15, 2025, USSS agents observed SUBJECT VEHICLE 2 parked on the street outside of SUBJECT PREMISES 3 at approximately 3:19 p.m.

61. On June 12, 2025, a USSS agent and Los Angeles District Attorney (LADA) Investigator conducted surveillance at SUBJECT PREMISES 3 which is the middle unit of a 3-unit residential structure. LADA Investigator Gee, posing as an Uber Eats delivery driver, spoke with a female residing in the front unit which is closest to the street on Plant Ave. and a male residing in the back unit furthest from the street whose door is adjacent to SUBJECT PREMISES 3. Both the male and female pointed at the door of SUBJECT PREMISES 3 and confirmed "Sergio" lived there.

**F. GPS Location Warrant**

62. On or about June 5, 2025, the Honorable K. Nicole Mitchell issued warrants pursuant to 18 U.S.C. § 2703 directing AT&T and Verizon to provide records about the location of

cellular phones believed to be used and in the possession of B. KIM and ANTEZANA.

63. Based on real-time location data records obtained from Verizon for a cellular device believed to be used and in the possession of B. KIM, the location data is consistent with geolocation points showing repeated proximity to SUBJECT PREMISES 1.

64. Based on real-time location data records obtained from AT&T for a cellular device believed to be used and in the possession by ANTEZANA, the location data is consistent with geolocation points showing repeated proximity to SUBJECT PREMISES 3.

65. The location data suggests that both B. KIM and ANTEZANA keep cellular devices on or around their person. I know based on my training and experience that such devices are used by people to commit fraud and launder money and such devices are likely to contain evidence of fraud and money laundering.

## V.  DOCUMENTARY AND ELECTRONIC RECORDS

66. By this application, I seek permission to search for records (in whatever form they are found) that might be located on the premises. One form in which the records might be found is data stored on a computer's hard drive or other storage media.

67. Through my training and experience, I am aware that people engaged in fraud and money laundering offenses often keep documentary and electronic records (collectively, "records")

that evidence their unlawful acts.  Also, as a general matter, I know that people scan, transfer, and save records, documents, photographs, and other materials that they want to preserve on to computers and other storage mediums.

68.  People involved in economic crimes, such as fraud and money laundering schemes, often maintain records that contain information associated with their fraudulent scheme.  These records often contain: (a) current and past banking, credit card, and financial information; and (b) past and current correspondence, such as letter, emails, and notes.

69.  Financial records are often in electronic form, given they are often stored on computers and other electronic storage medium and given that many people use computer software for their financial and tax activities.

70.  Finally, I am aware that people frequently use both business and personal cellular telephones (commonly called cell phones) for personal and professional communications and purposes.  Many cell phones have advanced capabilities, including: Internet browsing, text and email, photography and video storage, notes, calendars, and data file storage.  I am also aware, through training and experience, that people use cell phones to communicate with each other via voice, direct connect, text message, and e-mail; store valuable data such as names, and addresses; obtain and store directions and maps; search the Internet and capture audio, image, and video files.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[1]

71.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remains on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

      e.   Based on my training, experience, and information
from those involved in the forensic examination of digital
devices, I know that it is not always possible to search devices
for data during a search of the premises for a number of
reasons, including the following:

i.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

ii.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

f.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

i.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To

28

unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

ii.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

iii. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress B. KIM's or ANTEZANA'S thumb and/or fingers on the device(s); and (2) hold the device(s) in front of B. KIM's or ANTEZANA's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

g.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

29

## VII.  **CONCLUSION**

72.  For the reasons described above, there is probable cause to believe that evidence, contraband, fruits, and instrumentalities of the Subject Offenses described in Attachment B will be found in a search of the locations described in Attachments A-1 through A-7.

_____
Teresa Healy, Special Agent,
United States Secret Service


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 24th day of June
2025.


_____
HONORABLE BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE